[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

_____

**No. 04-15324**

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 22, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-02279-CV-HS-NW

SIERRA CLUB,
ALABAMA ENVIRONMENTAL COUNCIL, INC.,

Plaintiffs-Appellants,

versus

TENNESSEE VALLEY AUTHORITY,

Defendant-Appellee.

_____

**Appeal from the United States District Court
for the Northern District of Alabama**

_____

**(November 22, 2005)**

Before BIRCH, CARNES and FAY, Circuit Judges.

CARNES, Circuit Judge:

In this case the Sierra Club and the Alabama Environmental Council, two

environmental groups, sued the Tennessee Valley Authority under the Clean Air

Act, 42 U.S.C. §§ 7401 et seq., claiming that TVA's plant in Colbert County, Alabama violated the 20% opacity limitation, Ala. Admin. Code r. 335-3-4-.01(1)(a), which is part of Alabama's state implementation plan (SIP) approved by the Environmental Protection Agency. The complaint alleged that there were more than 8,900 violations during the five-year period from 1997 to 2002, and it sought declaratory and injunctive relief, as well as the imposition of civil penalties.

The district court granted summary judgment to TVA for two reasons. One of those reasons applies to all of the alleged violations; the other one applies only to the alleged violations occurring before May 20, 1999. The reason with broader application is that all of the alleged violations at the Colbert Plant are within the forgiveness zone of the Alabama Department of Environmental Management (ADEM)'s so-called "2% de minimis rule." That rule was initially just a practice, but has since been formally adopted as a regulation, Ala. Admin. Code r. 335-3-4-.01(4); it has not, however, ever been part of Alabama's SIP.

The second reason the court gave for granting summary judgment to TVA was based on the court's belief that data generated by the Colbert plant's continuous opacity monitoring system ("COMS"), which is all the evidence there is, cannot be used to establish opacity violations that occurred before May 20, 1999, the date ADEM adopted its "credible evidence rule," Ala. Admin. Code r.

335-3-1-.13(2). The district court also concluded that even if opacity violations at the plant were established, which would entitle the plaintiff groups to injunctive and declaratory relief, sovereign immunity principles would bar the assessment of civil penalties.

This is the appeal of the two plaintiff groups, which we will be referring to collectively as "the Sierra Club," except where the context requires separate reference. The Sierra Club challenges the district court's two bases for the finding that it had failed to prove any violations, and the additional ruling that even if it had succeeded, civil penalties should not be assessed against TVA.

We disagree with the district court's basis for denying any relief, because we agree with the Sierra Club that ADEM's use of the 2% de minimis rule throughout the period in question was an illegal, unilateral modification of the Alabama SIP. It was not, as urged by TVA and the State of Alabama (appearing here as an amicus curiae), simply an interpretation of Alabama's credible evidence rule which is part of its SIP. However, we agree with the district court that the Sierra Club has not established any violations of the opacity requirement before May 20, 1999, because all it has is COMS data, and that data cannot be used to show violations before Alabama adopted its credible evidence rule on that date. We also agree with

the district court that sovereign immunity principles bar the assessment of civil penalties against TVA in a Clean Air Act citizens suit such as this one.

After we set out the facts and applicable law in some detail and explain our reasoning in more depth, we will affirm the grant of summary judgment in favor of TVA with respect to the alleged violations occurring before May 20, 1999, but we will reverse the grant of summary judgment with respect to violations occurring on or after May 20, 1999. We will also affirm the grant of summary judgment to TVA insofar as it disallows civil penalties.

## I.

TVA operates eleven coal-fired electric power plants that generate electricity for customers in seven states. One of them is the Colbert plant which is located about ten miles west of Tuscumbia, Alabama, on the Tennessee River in the northwest corner of Alabama.

The Colbert plant has five generator units. To generate electricity, pulverized coal is burned in the furnace of a unit producing heat that is used to convert water into steam. The steam is transformed into rotational energy, which in turn is converted by a generator into electricity to be distributed throughout the TVA power grid. The coal combustion process also releases by-products that become air pollutants if they are not captured. The plant's pollution prevention

equipment does capture a significant amount of the pollutants (as much as 99.9% of some of them), but the remainder is released into the atmosphere through two tall smokestacks. The amount of air pollution is substantial in absolute terms: in 1999, for example, the Colbert plant emitted more than 90,000 tons of air pollutants.

At the time this lawsuit was filed, the Colbert plant was operating under permits ADEM had issued in March 1998. One of the requirements of the Colbert plant's air permits is that TVA install, maintain, and operate a continuous opacity monitoring system ("COMS") in each of the plant's smokestacks. See Ala. Admin. Code r. 335-3-12-.02(3). As its name indicates, COMS is a device that monitors continuously the opacity of a plume of smoke.

Opacity is one of the most basic emission limitations imposed on sources of particulate air pollution such as the Colbert plant's two smokestacks. The term "opacity" refers to the extent to which a plume of smoke "reduce[s] the transmission of light and obscure[s] the view of the background." Ala. Admin. Code r. 335-3-1-.02(1)(tt). For example, a plume with 20% opacity blocks 20% of light passing through it; no light passes through a plume with 100% opacity. Opacity is not a pollutant, but instead is a measure of the light-blocking property of a plant's emissions, which is important in the Clean Air Act regulatory scheme as

5

an indicator of the amount of visible particulate pollution being discharged by a source.

COMS measures opacity by projecting a beam of light across the interior diameter of a smokestack to a mirror mounted on the opposite side of the smokestack wall and measuring how much of the light is reflected back. COMS then records the amount of light that was absorbed or scattered on the trip. It is undisputed that at all relevant times each of the Colbert plant COMS has functioned properly, accurately measuring opacity.

**II.**

As required by Section 110 of the Clean Air Act, 42 U.S.C. § 7410, the State of Alabama maintains a state implementation plan ("SIP") to enforce national ambient air quality standards developed by EPA. Id. § 7410(a)(1). Alabama's SIP is codified at 40 C.F.R. § 52.69. It incorporates by reference certain provisions of ADEM's Air Pollution Control Program regulations set out at Ala. Admin. Code r. 335-3-1 et seq., see 40 C.F.R. § 52.69. Some provisions, however, have not been approved by EPA and therefore are not part of the Alabama SIP. Three provisions of the ADEM regulations are at issue in this case: (1) the 20% opacity limitation, Ala. Admin. Code r. 335-3-4-.01(1)-(2); (2) the 2% de minimis rule, Ala. Admin.

6

Code r. 335-3-4-.01(4); and (3) the credible evidence rule, Ala. Admin. Code r. 335-3-1-.13(2).

**A.**

The first provision, Alabama's opacity limitation, is incorporated into its SIP and provides as follows: "[N]o person shall discharge into the atmosphere from any source of emission, particulate of an opacity greater than that designated as twenty percent (20%) opacity, as determined by a six (6) minute average." Ala. Admin. Code r. 335-3-4-.01(1)(a) ("Visible Emissions Restrictions for Stationary Sources"). The opacity provision contains four exceptions to the 20% limitation: (1) an exception that allows any source to emit a plume with opacity of up to 40% for one six-minute period per hour; (2) a source-specific exception for "startup, shutdown, load change, and rate change or other short, intermittent periods upon terms approved by the Director [of ADEM] and made a part of [the source's] permit"; (3) an exception that allows the Director of ADEM to adjust the opacity limitation for a source that discharges a pollutant for which there is no ambient air quality standard; and (4) a domestic source exception. Id. r. 335-3-4-.01(1)(b)–(e). As required by its air permits, TVA submits quarterly excess emissions reports that indicate the total number of six-minute periods during which plume opacity

7

data generated by each of its COMS showed that opacity exceeded 20%. See also id. r. 335-3-1-.04(2)(d).

Alabama's opacity regulation also provides that "[c]ompliance with opacity standards . . . shall be determined by conducting observations in accordance with Reference Method 9 . . . ." Id. r. 335-3-4-.01(2). Reference Method 9 relies on a state-certified observer visually gauging the opacity of a plume of smoke as it leaves a smokestack. 40 C.F.R. Pt. 60, App. A-4, Method 9. The method provides the minimum qualifications for certification of observers and outlines procedures that they should follow in the field. Id. Method 9 §§ 2-3. Under Method 9, opacity observations are conducted only periodically; in a year a typical source is tested under Method 9 on not more than fifteen days and as infrequently as on one day. Another drawback of Method 9 is that observations generally may be performed only during daylight.

Conspicuously absent from both Ala. Admin. Code r. 335-3-4-.01(2) and Method 9 is authorization to measure opacity using COMS.[1] More about that later.

_____

[1] An alternative to Method 9, contained in an EPA regulation, is the use of a mobile "lidar" ("Laser Radar" or "Light Detection and Ranging") system. The Lidar system generates its own light source and may be used to measure opacity remotely at any time, day or night. 40 C.F.R. Pt. 60, App. A-4, Alt. Method 1. Lidar is operated by an observer on the ground while COMS uses equipment mounted inside the smokestack itself. The Sierra Club describes Lidar as "[a] second method for determining opacity compliance." TVA says that Lidar is not prescribed for use as a compliance test by Alabama's regulations. It does not matter, because everyone agrees that no Lidar data was submitted in this case. For that reason, we will ignore Lidar when we are talking about the regulations and the issues arising from them.

**B.**

The second provision of the ADEM regulations at issue in this case is the so-called "2% de minimis rule." It provides a safe harbor from the 20% opacity limitation if "[d]uring each calendar quarter, . . . the non-exempt excess emissions periods do not exceed 2.0 percent of the source operating hours for which the opacity standard is applicable and for which the COMS is indicating valid data." Ala. Admin. Code r. 335-3-4-.01(4); see also id. r. 335-3-4-.01(3). In other words, under this rule TVA's emissions, as measured by COMS, may exceed the 20% opacity limitation for up to two percent of the operating hours of the plant in each quarter, measured in six-minute intervals and excluding times during which an exception applies.

The 2% de minimis rule was not officially adopted as part of the ADEM regulations until October 2003, more than one year after the Sierra Club filed this lawsuit. Before formally adopting the rule in October 2003 and submitting it to EPA as a SIP revision, ADEM followed the rule in practice. It is the rule as an ADEM "practice"—instead of the later, formal embodiment of it as a regulation—that is at issue in this case. The rule is not—and has never been—a part of the Alabama SIP, because EPA has never approved it.

9

## C.

The third provision of the ADEM regulations at issue is Alabama's credible evidence rule, which became effective May 20, 1999. That rule provides in pertinent part: "Notwithstanding any other provision in [the ADEM regulations], any credible evidence or information relevant to whether a source would have been in compliance with applicable requirements if the appropriate performance or compliance test had been performed, can be used to establish whether or a not an owner or operator has violated or is in violation of any rule or standard in this Division." Ala. Admin. Code r. 335-3-1-.13(2). The EPA mandated that each state adopt its own credible evidence rule in part "to clarify that the inclusion in a state implementation plan (SIP) of enforceable test methods for SIP emissions limits does not preclude enforcement based on other credible evidence or information . . . ." Credible Evidence Revisions, 62 Fed. Reg. 8314, 8316 (Feb. 24, 1997) (to be codified at 40 C.F.R. pts. 51, 52, 60, and 61) (discussing revision to 40 C.F.R. § 51.212(c), which requires each SIP to include provisions for enforceable test methods for determining compliance with emission limits).

As we discuss just below, the district court found and the parties agree that the credible evidence rule authorizes using COMS data to establish opacity violations on or after its effective date, May 20, 1999.

10

**III.**

On September 16, 2002, the Sierra Club sued TVA in the Northern District of Alabama, alleging 8,933 violations of Alabama's 20% opacity limitation at the Colbert plant from the beginning of the third quarter of 1997 through the end of the second quarter of 2002. The Sierra Club calculated the number of violations using the Colbert plant's COMS data submitted to ADEM in TVA's quarterly excess emissions reports for the plant. The Sierra Club sought: a declaration that TVA had violated the Clean Air Act, its air permit, and the Alabama SIP; a preliminary and a permanent injunction against the violations; a civil penalty of $27,500 per day for each of TVA's violations; and an assessment of attorney's fees and litigation costs.

In January 2003 TVA moved for partial summary judgment on the Sierra Club's claims for civil penalties. The district court granted that motion on sovereign immunity grounds, citing Department of Energy v. Ohio, 503 U.S. 607, 112 S. Ct. 1627 (1992) (holding that the United States had not waived sovereign immunity from liability for civil fines arising from past violations of the Clean Water Act or the Resource Conservation and Recovery Act).

In August 2003 the Sierra Club and TVA filed cross-motions for summary judgment on the remaining claims for declaratory and injunctive relief. At the

11

hearing on those motions, TVA conceded that the COMS data shows that during the relevant five-year time period the Colbert plant exceeded 20% opacity 8,933 times.

Nonetheless, the district court granted summary judgment in favor of TVA. The court held that COMS data could not be used to prove violations of the 20% opacity limitation prior to the effective date of ADEM's credible evidence rule on May 20, 1999. Because the COMS data is the only evidence of violations at the Colbert plant and the Sierra Club has no Reference Method 9 data, the district court concluded that TVA was entitled to judgment as a matter of law on the Sierra Club's claims for declaratory and injunctive relief arising from the pre-May 20, 1999 violations.

With respect to violations occurring after the credible evidence rule became effective on May 20, 1999, the district court concluded that COMS data may be "properly considered." Addressing the alleged violations occurring on or after that effective date, the district court first determined that ADEM had consistently employed the 2% de minimis rule in determining whether COMS data showed violations of the 20% opacity limitation even before the rule was formally adopted in 2003. The court observed that "[t]here is no evidence that ADEM ever told TVA that the COMs data showed a violation, despite exceedances above 20% on

numerous occasions." Additionally, the court noted that when ADEM proposed the 2% de minimis rule for adoption as part of the regulations, it stated that the rule "'would serve to codify the practices that [ADEM] has been and is currently utilizing regarding COMS data.'"

The district court apparently construed ADEM's unofficial practice of using the 2% de minimis rule before its incorporation into the regulations in October 2003 to be an interpretation of the credible evidence rule. The court explained that it must defer to ADEM's interpretation of the ADEM regulations if reasonable. The court then determined that using COMS data instead of periodic Method 9 observations to determine opacity violations would increase the stringency of the 20% opacity limitation. Although it did not explicitly state its rationale, the court apparently found that ADEM's use of the 2% de minimis rule was reasonable in light of what it considered to be the increased stringency of the opacity limitation when COMS data, instead of Method 9, was used to measure violations. Applying the 2% de minimis rule, the district court found that the Colbert plant's COMS data did not show any violations of the 20% opacity limitation on or after May 20, 1999. So, it granted summary judgment to TVA on that part of the case, also.

**IV.**

In the district court TVA sought dismissal of the lawsuit on grounds that the two plaintiff groups lacked standing. The district court did not address the issue, and TVA has not renewed its standing arguments on appeal. That does not take the issue off the table, however, because "we are obliged to consider questions of standing regardless of whether the parties have raised them." Bochese v. Town of Ponce Inlet, 405 F.3d 964, 975 (11th Cir. 2005). We decide standing issues de novo. Id.

The basics are familiar. An individual plaintiff has standing under the Constitution's case-or-controversy limitation, Art. III, § 2, where "(1) [the plaintiff] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81, 120 S. Ct. 693, 704 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561, 112 S. Ct. 2130 (1992)). The two plaintiff groups in this case are the Sierra Club and the Alabama Environmental Council. An association "has standing to bring suit on behalf of its members when [1] its members would

14

otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id. at 181, 120 S. Ct. at 704. Standing has to exist for each category of relief sought, not only for declaratory and injunctive relief, but also for civil penalties. Id. at 184, 120 S. Ct. at 706.

The first requirement of associational standing is that at least one member meets the three requirements of individual standing. In environmental case, an individual plaintiff may show the first of those requirements, injury in fact, by attesting that he uses, or would use more frequently, an area affected by the alleged violations and that his aesthetic or recreational interests in the area have been harmed. See id. at 183–84, 120 S. Ct. at 705–06; see also Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1004 n.11 (11th Cir. 2004); Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1242–43 (11th Cir. 2003). Members of the Sierra Club and the Alabama Environmental Council have done that in this case.

For example, Dusty D. Farned, an Alabama Environmental Council member, stated in an affidavit that he regularly saw plumes of smoke from the Colbert plant as he drove across a bridge over the Tennessee River to get to high school from

15

1997 to 2001. Farned also attested that he finds it "frightening" to breathe air polluted by the Colbert plant; that vistas in the area around the plant have been harmed by its emissions; and that he refrains from boating and hunting in areas near the Colbert plant because of its emissions. Ralph Lamar Marshall, a member of both the Sierra Club and the Alabama Environmental Council, testified in a deposition that he engages in kayaking, fishing, and swimming on or in the Tennessee River near the Colbert plant, and that his enjoyment of those activities has been impaired by emissions from the plant.

The second and third requirements of individual standing are also met in this case. Because Farned and Marshall attested that their experiences in the natural areas around the Colbert plant are negatively affected by the Colbert plant's emissions, their respective injuries are traceable to the alleged violations. The primary remedy sought by the plaintiffs, an injunction against violations of Alabama's 20% opacity limitation, will lessen Farned's and Marshall's injuries. Civil penalties, even though paid to the Treasury, have "a deterrent effect." Laidlaw Envtl. Servs., 528 U.S. at 187, 120 S. Ct. at 707. In that way, as coercive fines aimed at ongoing conduct, civil penalties would redress injuries to Farned and Marshall from violations at the TVA plant "by abating current violations and preventing future ones . . . ." See id., 120 S. Ct. at 707.

16

Having determined that the individual members have standing to sue in their own right, we turn to the second and third requirements of associational standing: whether the interests at stake are germane to the plaintiff organizations' purposes, and whether the claim or relief requested requires the participation of their individual members in the lawsuit. Obtaining an order that requires TVA's Colbert plant to comply with the opacity regulation furthers the organizations' stated purposes. For example, one of Alabama Environmental Council's primary purposes is "to . . . aid in the preservation of areas in the State of Alabama which are of scenic, ecological, biological, historical, or recreational importance." The Sierra Club's articles of incorporation set forth as among its purposes: "to practice and promote the responsible use of the earth's ecosystems and resources" and "to use all lawful means to carry out these objectives."

Lastly, there is no reason why the claim or relief requested by the Sierra Club or the Alabama Environmental Council requires the participation of Farned, Marshall, or any other member of either association. See Nat'l Parks Conservation Ass'n, 324 F.3d at 1244 (holding that the third prong of associational standing test was met where individual members did not need to be made parties to the suit "in order to advance the [association's Fifth Amendment] equal protection claim or to fashion the sort of prospective injunctive relief sought by appellants").

17

Having satisfied ourselves that the two plaintiff groups have standing, we proceed to a discussion of the merits.

**V.**

We review <u>de novo</u> the district court's grant of summary judgment to TVA. <u>Gilmour v. Am. Nat'l Red Cross</u>, 385 F.3d 1318, 1321 (11th Cir. 2004). Summary judgment is proper only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. <u>Walton v. Johnson & Johnson Servs., Inc.</u>, 347 F.3d 1272, 1279 (11th Cir. 2003). All material facts being undisputed in this case, everything comes down to issues of law. While it is generally true that we review a district court's denial of injunctive relief only for abuse of discretion, that rule means nothing where, as here, injunctive relief was denied solely because summary judgment was granted. <u>See</u> <u>Teper v. Miller</u>, 82 F.3d 989, 993 (11th Cir. 1996). Because the grant of summary judgment is not a discretionary act, all review in this case is <u>de</u> <u>novo</u>.

**VI.**

We begin with the question of whether ADEM's 2% de minimis rule, followed as a practice at all times relevant to this lawsuit, applies to excuse the violations alleged in the complaint. If it does, the lawsuit is over. Although the COMS data show thousands of instances where the Colbert plant's emissions

exceeded 20% opacity during the relevant period, none of those instances are violations if the 2% de minimis rule applied. We have already discussed the specifics of that rule and the parameters of the safe harbor it provides for pollutant discharges. See Part II. B, above. We need not reiterate the technical details because both sides agree that if the 2% de minimis rule is valid, there are no violations; if it is not, there are plenty.

To be valid and applicable in determining violations of the opacity limitation contained in Alabama's SIP, the 2% de minimis rule must itself be authorized or permitted by the SIP. Here is why.

Subject to several exceptions not applicable here, Clean Air Act § 110(i), entitled "Modification of Requirements Prohibited," provides that: "no order, suspension, plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator." 42 U.S.C. § 7410(i); see also Duquesne Light Co. v. EPA, 698 F.2d 456, 468 n.12 (D.C. Cir. 1983) (citing that provision and stating that "[w]ith certain enumerated exceptions, states do not have the power to take any action modifying any requirement of their SIPs, without approval from EPA"). This section of the Clean Air Act prevents a state from unilaterally modifying any requirement contained in a SIP, including Alabama's

19

20% opacity limitation. See 42 U.S.C. § 7602(k) (defining "emission limitation" or "emission standard" as a "requirement").[2]

If a state wants to add, delete, or otherwise modify any SIP provision, it must submit the proposed change to EPA for approval. See 40 C.F.R. § 52.1384 (explaining "the requirement of section 110(i) that the SIP can be modified only through the SIP revision process"). The EPA, in turn, may "not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress . . ., or any other applicable requirement [of the Clean Air Act]." 42 U.S.C. § 7410(l); see also id. § 7410(a)(2)(H), (k).

ADEM's 2% de minimis rule is tantamount to an unapproved modification of the opacity limitation contained in the Alabama SIP, because application of the rule changes what would otherwise be violations of that limitation into non-violations. There are a number of examples (according to the Sierra Club, 8,933) of that in the record in this case. The 20% opacity limitation in the SIP provides that "no person shall discharge into the atmosphere from any source of emission, particulate of an opacity greater than that designated as twenty percent (20%)

_____

[2] The prerequisite terms of § 110(i) are clearly met. The Colbert plant is a "stationary source." See 42 U.S.C. § 7602(z). The Alabama SIP is an "applicable implementation plan." See id. § 7602(q).

20

opacity, as determined by a six (6) minute average." Ala. Admin. Code r. 335-3-4-.01(1)(a). The 2% de minimis rule provides that, the 20% opacity limitation contained in the SIP notwithstanding, any person may discharge from a COMS-monitored source emissions in excess of that limitation for as many as two percent of the source's operating hours in each quarter.

The 2% de minimis rule effectively revises the opacity limitation contained in the SIP—a revision by any other name is still a revision—and an unapproved revision of any part of an SIP is invalid under § 110(i) of the Clean Air Act. See Train v. Natural Res. Def. Council, Inc., 421 U.S. 60, 92, 95 S. Ct. 1470, 1488 (1975) ("[A] polluter is subject to existing requirements until such time as he obtains a variance, and variances are not available under the revision authority until they have been approved by both the State and the Agency."); United States v. Ford Motor Co., 814 F.2d 1099, 1103 (6th Cir. 1987) (holding that "invalidation of a SIP on technical grounds by a state court . . . cannot be given effect, because . . . revisions and variances of properly promulgated SIPs require EPA approval"); 40 C.F.R. § 51.105 ("Revisions of a plan, or any portion thereof, will not be considered part of an applicable plan until such revisions have been approved by [EPA] in accordance with this part.").

TVA does not seriously dispute this reasoning, if the 2% de minimis rule does amount to a revision of the SIP; instead, it focuses its argument on the "if" premise. TVA contends, and the district court concluded, that ADEM's use of the 2% de minimis rule is simply ADEM's interpretation of the credible evidence rule. The credible evidence rule, which is contained in the SIP, provides that any credible evidence may be used to establish a violation of a pollution limitation, including the opacity limitation. Ala. Admin. Code r. 335-3-1-.13(2).

Before the credible evidence rule was added to Alabama's SIP, the opacity provision in the SIP stated that the only authorized method for determining opacity violations was by use of Reference Method 9, Ala. Admin. Code r. 335-3-4-.01(2), which, as we have discussed, depends on readings performed only a few times a year by observers in the field. See Part II. A, above. This is how a former ADEM deputy director described the Method 9 enforcement situation:

> Because compliance with the opacity standard using Method 9 readings is determined for most sources during 1-15 days/year, a typical source would be subjected to 2-30 hours of compliance determinations per year using Method 9. This represents less than 0.5% of the available operating hours. If plant variability and malfunctions causing elevated opacity occur at a source 3% of the time, the chances of such events coinciding with a Method 9 observation are remote.

(Affidavit of Richard E. Grusnick in support of TVA's motion for summary judgment.)  The credible evidence rule, added to Alabama's SIP at EPA's insistence, changed the situation entirely, because it allowed use of COMS data to determine opacity violations.  Instead of enforcement being based on less than one-half of one percent of a source's operation, and only that occurring during daylight hours, enforcement is now based upon all emissions.

TVA, joined by its friend the State of Alabama, contends that increasing the effectiveness of enforcement increases the stringency of any standard that is being enforced.  Under this view, ADEM's use of the 2% de minimis rule is necessary to offset the increased effectiveness of COMS in discovering violations of the 20% opacity limitation.  The gist of TVA's argument is that a 2% safe harbor from the opacity limitation is needed to loosen the tighter pinch of the opacity limitation when enforced through the relentlessly effective COMS method with the hit-and-miss (mostly miss) enforcement possible with Method 9.  It's a brassy argument.

TVA points to nothing in the record that gives the slightest support for the notion that ADEM in proposing the 20% opacity limitation, or EPA in approving it, counted on industries getting away with more pollution than stated in the limitation because of ineffective enforcement.  Nor is there anything in the record to indicate that when EPA insisted on, and then approved as an amendment to

23

Alabama's SIP, the credible evidence rule, EPA intended to modify implicitly and downward the 20% opacity limitation. To the contrary, EPA is adamant that the credible evidence rule should not be interpreted or applied to alter the emission standard being enforced. In explaining why, EPA uses this helpful metaphor: "[A]llowing the use of radar guns or increasing the number of police checking for speeding may raise the chance that a speeder will be detected, but this does not alter the legal stringency of a posted speed limit." Credible Evidence Revisions, 62 Fed. Reg. at 8326.

Similarly, although using COMS data to determine violations of the 20% opacity limitation increases the likelihood that pollution violators will be detected, it does not alter the posted emission limit. The Clean Air Act does not assume an accepted level of undetected non-compliance; it provides that there is to be continuous compliance with pollution limitations. See 42 U.S.C. § 7602(k) ("The terms 'emission limitation' and 'emission standard' mean a requirement . . . which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis . . . .") (emphasis added). A state's "interpretation" of its SIP cannot change the act's mandate of continuous compliance.

ADEM's 2% de minimis rule is an attempt to unilaterally revise the opacity limitation without submitting the revision to the rigors of the SIP amendment

process. What was missed by this unilateral revision or "interpretation" approach is illustrated by the procedures employed when ADEM finally started in 2003—long after the conduct relevant to this case had occurred—the process necessary to revise the SIP to include the 2% de minimis rule. At that time, as required by 40 C.F.R. § 51.102(a)(1) and 42 U.S.C. § 7410(a)(1), ADEM held public hearings and accepted public comment (including some from the Sierra Club) on the proposal to add the 2% de minimis rule to the Alabama SIP. Prior to that 2003 proposal, however, ADEM never gave any notice and never held any hearings about the rule that it was informally using to excuse thousands of opacity violations. Moreover, neither ADEM nor TVA has offered any formal documentation of ADEM's "interpretation" of the Alabama SIP to allow for the 2% de minimis rule prior to 2003, other than documents generated after the Sierra Club announced its intention to sue.

This lack of pre-litigation documentary support for establishing the 2% de minimis rule gives rise to some obvious questions. Where did the 2% de minimis rule come from? Who actually proposed it to ADEM? Why was the de minimis line drawn at 2%, instead of 1%, 3%, 5%, or 10% ? In the "Summary of Reasons Supporting the Adoption of the Proposed Amendment," which discussed the 2% de minimis rule and was published after this litigation began, ADEM stated only that

25

it was proposing that SIP revision to "codify [its] practices" and to "provide certainty to the regulated community as to what is expected with respect to opacity performance as measured by a COMS." It provided no other explanation for, or history of, the rule.

There is no pre-2003 evidence mentioning the 2% de minimis rule. The record does include nineteen letters from ADEM to TVA containing the agency's responses to the quarterly emissions reports TVA filed for the Colbert plant. None of those letters cited TVA for violations of the 20% opacity limitation, but none of them mentioned the 2% de minimis rule either.

Earlier in this opinion we discussed the four exceptions to the 20% opacity limitation that are contained in the SIP, which EPA approved. See Part II. A, above. The 2% de minimis rule is no less an exception than the four contained in the SIP. The critical difference is that during the time period involved in this case, the 2% de minimis rule, unlike the other four exceptions, had not been subjected to the formal rulemaking process or submitted to EPA for approval.

By using an informal, non-public, undocumented "interpretation" method of revising the SIP before 2003, ADEM short-circuited the important protections against uninformed and arbitrary rulemaking, and it attempted to avoid entirely EPA oversight of the SIP process. It tried an impermissible end-run around the

26

SIP revision process. See Pennzoil Co. v. FERC, 645 F.2d 360, 371 (5th Cir. May 1981)[3] ("The purpose of the Administrative Procedure Act . . . notice and comment requirement is that the agency educate itself before adopting a final order. This assures fairness and mature consideration of rules having a substantial impact on those regulated."); see also Dismas Charities, Inc. v. Dep't of Justice, 401 F.3d 666, 678 (6th Cir. 2005) (explaining that "one of the central purposes of the requirement of notice and comment is to give those with interests affected by rules the chance to participate in the promulgation of the rules . . . [in order to] ensure fair treatment for persons to be affected by regulations"); MCI Telecomms. Corp. v. FCC, 57 F.3d 1136, 1142 (D.C. Cir. 1995) (stating that "an agency may not turn the provision of notice into a bureaucratic game of hide and seek"). The EPA has never sanctioned ADEM's use of the 2% de minimis rule and has yet to accept or reject it as a proposed SIP revision.

For all of these reasons, ADEM's practice of employing the 2% de minimis rule to determine violations of the 20% opacity limitation using COMS data was invalid under Clean Air Act § 110(i). Because we reject the district court's conclusion and TVA's contention that ADEM's use of the 2% de minimis rule is a

---

[3] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981. Id. at 1209.

permissible interpretation of the Alabama credible evidence rule, we do not need to discuss further the parties' arguments concerning deference to state administrative interpretations under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778 (1984), and its progeny. TVA is not entitled to summary judgment on the broad ground that the COMS data did not show a violation of the opacity limitation when viewed in light of the 2% de minimis rule.

## VII.

We now turn to the more narrow ground on which TVA sought and the district court granted summary judgment concerning the existence of violations: that the Colbert plant's COMS data may not be used to determine violations of the 20% opacity limitation prior to May 20, 1999, the effective date of the Alabama credible evidence rule. Because the Sierra Club has only the COMS data, if that type of data may not be used to establish violations before May 20, 1999, TVA is entitled to summary judgment insofar as all violations before that date are concerned.

## A.

Alabama's opacity regulation provides that "[c]ompliance with opacity standards . . . shall be determined by conducting observations in accordance with Reference Method 9 . . . ." Ala. Admin. Code r. 335-3-4-.01(2) (emphasis added).

28

The key word is "shall" and its usage here is not ambiguous. As the Supreme Court has stated, "'shall' . . . normally creates an obligation impervious to judicial discretion." Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 35, 118 S. Ct. 956, 962 (1998) (interpreting "shall" in the multidistrict litigation statute, 28 U.S.C. § 1407); see also Anderson v. Yungkau, 329 U.S. 482, 485, 67 S. Ct. 428, 430 (1947) ("The word 'shall' is ordinarily '[t]he language of command.'") (citation omitted); Global Satellite Commc'n Co. v. Starmill U.K. Ltd., 378 F.3d 1269, 1272 (11th Cir. 2004) ("The contract provision, 'Venue shall be in Broward County,' because it uses the imperative 'shall,' is most reasonably interpreted to mandate venue in Broward County, and Broward County alone."). The plain language of this regulation is a command that only opacity data collected by a field observer using Method 9 may be used to determine compliance.

The Sierra Club argues that the plain language of Alabama's opacity regulation should not be read as ruling out the use of COMS data for determining violations before the credible evidence rule was adopted, because of the existence of two other regulations, both of which have been around for years. One of them requires COMS installation, Ala. Admin. Code r. 335-3-12-.02(3), and the other requires that COMS data be reported to ADEM, id. r. 335-3-1-.04(2)(d).[4] Those

_____

[4] TVA's ADEM-issued air permits reflect these regulatory requirements: TVA must install COMS to measure opacity and include "average and maximum excess emissions over

29

requirements, however, have a purpose apart from the use of COMS data to measure compliance.

The record shows that although ADEM did not use COMS data to determine compliance with the 20% opacity limitation before the credible evidence rule was adopted, ADEM did use that data as an indicator of whether a plant's particulate emission control technologies were working properly and to determine whether an extensive particulate compliance test was necessary. (Report of Richard E. Grusnick in support of TVA's motion for summary judgment.) Given the alternative purpose for gathering and reporting COMS data, any implication that can be drawn from the two COMS-related regulations is not strong enough to overcome the clear command of Alabama's opacity regulation itself. See Ala. Admin. Code r. 335-3-4-.01(2). The command is that only Method 9 data may be used to determine opacity violations, and that command governed until Alabama's credible evidence rule, Ala. Admin. Code r. 335-3-1-.13(2), became effective on May 20, 1999.

Although it relates to evidence, the credible evidence rule does not apply retroactively. Retroactive application of administrative rules is highly disfavored, and they "'will not be construed to have retroactive effect unless their language

---

20% [opacity] computed from six-minute averages" in quarterly reports to ADEM. ADEM Permit No. 701-0010-Z009 at 3.

30

requires this result.'"  Landgraf v. USI Film Prods., 511 U.S. 244, 264, 114 S. Ct. 1483, 1496 (1994) (quoting Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208, 109 S. Ct. 468, 471 (1988)).  The language of the rule does not require retroactive application.  It actually points the other way.  The rule expressly provides that it will become effective on a date certain, May 20, 1999.  There is no point in specifying an effective date if a provision is to be applied retroactively.

For these reasons, we conclude, as the district court did, that COMS data cannot be used to determine whether pre-May 20, 1999 emissions violated the opacity limitation, at least not so far as Alabama's regulations are concerned.  That conclusion leads to the Sierra Club's remaining contention relating to the emissions during that time period.

**B.**

The Sierra Club contends that the federal credible evidence rule, 40 C.F.R. § 52.12(c), which became effective in April 1997, authorized the use before May 20, 1999 of COMS data to prove opacity violations at the Colbert plant.  The federal credible evidence rule provides:

> For purposes of Federal enforcement, the following test procedures and methods shall be used, provided that for the purpose of establishing whether or not a person has violated or is in violation of any provision of the plan, nothing in this part shall preclude the use, including the exclusive use, of any credible evidence or information,

31

relevant to whether a source would have been in compliance with applicable requirements if the appropriate performance or compliance test procedures or methods had been performed:

(1) Sources subject to plan provisions which do not specify a test procedure and sources subject to provisions promulgated by the Administrator will be tested by means of the appropriate procedures and methods prescribed in part 60 of this chapter unless otherwise specified in this part.

(2) Sources subject to approved provisions of a plan wherein a test procedure is specified will be tested by the specified procedure.

40 C.F.R. § 52.12(c)) (emphasis added).[5]

The Sierra Club's position is that on its effective date in April 1997 the federal credible evidence rule automatically became part of the enforcement provisions in every state SIP. We don't think so. When EPA adopted the regulation containing the federal credible evidence rule in 1997, it included a separate provision requiring each state to adopt through the SIP process its own credible evidence rule. See 40 C.F.R. § 51.212(c). Alabama complied. ADEM promulgated its own credible evidence rule, submitted it to EPA for approval as a SIP provision, and in November 1999 EPA approved it. See Approval and

_____

[5] This provision was revised along with four other provisions, including 40 C.F.R. § 51.212(c) as noted in Part II. C, above, as part of EPA's Credible Evidence Revisions final rulemaking of February 24, 1997. See 62 Fed. Reg. at 8314-28. Revisions were also made to 40 C.F.R. §§ 52.30, 60.11, and 61.12. Credible Evidence Revisions, 62 Fed. Reg. at 8328.

Promulgation of Implementation Plans: Revisions to the Alabama Department of Environmental Management (ADEM) Administrative Code for the Air Pollution Control Program, 64 Fed. Reg. 59,633 (Nov. 3, 1999). If the federal credible evidence rule was already a part of the Alabama SIP, as the Sierra Club contends, there would have been no point in EPA's insisting that each state adopt its own rule and in Alabama's doing so.

The EPA's own statements in reference to the Credible Evidence Revisions support this analysis: "On February 24, 1997, EPA promulgated regulations . . . that gave EPA the authority to use all available data to prove [Clean Air Act] violations." 64 Fed. Reg. at 59,633 (emphasis added). It did not give any other party the authority to use all available data to prove a violation. Before EPA's approval of the Alabama credible evidence rule, the state's SIP did not contain one.[6] See Clean Air Implementation Project v. EPA, 150 F.3d 1200, 1206 (D.C. Cir. 1998) (noting that in response to comments during the credible evidence rulemaking that the Credible Evidence Revisions were unauthorized, EPA stated:

---

[6] Recall that the Alabama credible evidence rule's effective date in the ADEM regulations was May 20, 1999, which is the date that the district court found, and the parties agree, is proper to begin consideration of COMS data to prove opacity violations. However, EPA's approval of the Alabama credible evidence rule took effect January 3, 2000, which is the date the rule became a part of the Alabama SIP. Approval and Promulgation of Implementation Plans: Revisions to the Alabama Department of Environmental Management (ADEM) Administrative Code for the Air Pollution Control Program, 64 Fed. Reg. at 59,633.

"EPA is not by this rulemaking revising any SIP; rather, EPA is amending the rules governing SIPs.").

Moreover, by its own terms, the federal credible evidence rule applies only "[f]or purposes of Federal enforcement." 40 C.F.R. § 52.12(c). Section 113 of the Clean Air Act, "Federal enforcement," authorizes EPA to issue notices and orders, assess administrative penalties, and bring civil actions against "any person [who] has violated or is in violation of any requirement or prohibition of an applicable [SIP] or permit . . . ." 42 U.S.C. § 7413(a)(1)–(2), invalidated in part by TVA v. Whitman, 336 F.3d 1236, 1260 (11th Cir. 2003) (declaring administrative consent orders under Section 113 unconstitutional under the Due Process Clause of the Fifth Amendment "to the extent that mere noncompliance with the terms of an [administrative consent order] can be the sole basis for the imposition of severe civil and criminal penalties"), cert. denied, Leavitt v. TVA, 541 U.S. 1030, 124 S. Ct. 2096 (2004). The EPA may also "request the Attorney General to commence a criminal action . . . ." 42 U.S.C. § 7413(a)(3)(D). The agency, however, cannot bring citizen suits, which are separately authorized by Section 304 and are not "federal enforcement" under Section 113.[7] Therefore, the plain language of the

_____

[7] Section 113 refers to § 304 (which is § 7604(a) of Title 42) only in its provision for "Penalty assessment criteria." 42 U.S.C. § 7413(e)(1)–(2) ("In determining the amount of any penalty to be assessed under this section or section 7604(a) of this title . . . .")

34

regulation containing the federal credible evidence rule makes it unavailable in citizen suits to enforce the emission limitations contained in a state implementation plan.

It is true that in adopting the federal credible evidence rule provisions, EPA declared that its action: "creates no new rights or powers for citizen enforcers; instead, the rule clarifies existing EPA regulations. Citizens have been free to use credible evidence in Clean Air Act enforcement, and have won at least two court cases using it." Credible Evidence Revisions, 62 Fed. Reg at 8318 (citing Unitek Envtl. Servs., Inc. v. Hawaiian Cement, 1997 U.S. Dist. LEXIS 19261 (D. Haw. 1997) (allowing use of data from air monitoring and modeling, expert testimony, and eyewitness observations to establish violations of primary particulate emission limitation in a suit between adjacent landowners for civil penalties under Clean Air Act § 113(e), which specifically provides for the use of "any credible evidence" to establish the duration of a violation) and Sierra Club v. Pub. Serv. Co. of Colorado, Inc., 894 F. Supp. 1455 (D. Colo. 1995) (allowing use of COMS data to establish opacity violations where the Colorado regulation provided solely for use of Reference Method 9). Elsewhere in its explanation of the revisions, however, EPA stated: "Today's rulemaking is intended to clarify that EPA's regulations do not constrain EPA to using reference tests to prove a violation of an emission standard.

Rather, <u>EPA</u> retains its full authority under [Clean Air Act] Section 113(a) to use 'any information' as the basis for an enforcement action." Credible Evidence Revisions, 62 Fed. Reg at 8320 (emphasis added). Those comments indicate, as does the plain language of the federal rule itself ("For purposes of Federal enforcement . . ."), that the federal credible evidence rule did not amend any state SIP and does not apply directly to citizen suits. The plain language of the rule coupled with some consistent indication in the accompanying explanation trumps an inconsistent indication elsewhere in the explanation.[8]

Because we hold that the Alabama credible evidence rule did not apply prior to its adoption on May 20, 1999, and because the federal credible evidence rule does not apply, we affirm the district court's grant of summary judgment to TVA on the alleged opacity violations occurring before May 20, 1999.

## VIII.

Finally, we address the district court's grant of summary judgment to TVA on the Sierra Club's claim for a civil penalty of $27,500 per day on which a violation occurred. Here we are talking about violations that occurred on or after

---

[8] Clean Air Act § 113(e)(1) explicitly provides that "any credible evidence" may be used to establish the duration of a violation for purposes of assessing civil penalties in citizen suits under § 304 as well as federal enforcement actions under § 113. 42 U.S.C. § 7413(e)(1). That provision does not mention declaratory and injunctive relief but only civil penalties. Because, as we explain in Part VIII., civil penalties cannot be awarded in this case, that provision of the Act has no bearing on this case.

May 20, 1999 because, in light of our holding in the preceding part, they are the

only alleged violations left in the case.  The issue is whether Congress waived the

sovereign immunity of TVA, a federal agency, from liability for punitive fines

imposed for past conduct—as opposed to coercive fines for ongoing conduct—in

citizen suits under Clean Air Act § 304.

Section 304(a) provides as follows:

(a) Authority to bring civil action; jurisdiction

Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf--

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation,

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator, or

(3) against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I of this chapter (relating to significant deterioration of air quality) or part D of subchapter I of this chapter (relating to nonattainment) or who is alleged to have violated (if

37

> there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.
>
> The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties (except for actions under paragraph (2)) . . . .

42 U.S.C. § 7604(a) (emphasis added). The parties agree that injunctive relief and coercive fines to enforce compliance with an injunction are available in citizen suits against the United States under the Clean Air Act. The district court, relying on Department of Energy v. Ohio, 503 U.S. 607, 112 S. Ct. 1627 (1992), held that § 304(a) does not waive the federal government's sovereign immunity against punitive fines for past violations, and for that reason it granted summary judgment to TVA on the Sierra Club's request for civil penalties.

In Department of Energy v. Ohio, the Supreme Court held that the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365(a), does not waive the federal government's sovereign immunity with respect to punitive fines for past

38

conduct.[9]  503 U.S. at 619-20, 112 S. Ct. at 1635–36.  The Clean Water Act citizen suit provision provides, in pertinent part:

> [A]ny citizen may commence a civil action on his own behalf–
>
> (1) against any person (<u>including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution</u>) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter . . . .
>
> . . . .
>
> <u>The district courts shall have jurisdiction</u> . . . to enforce such an effluent standard or limitation, . . . and <u>to apply any appropriate civil penalties under section 1319(d) of this title.</u>

33 U.S.C. § 1365(a) (emphasis added).  Section 1319(d), in turn, provides for a maximum $25,000 per day civil penalty against "any person" who violates certain sections of the Clean Water Act, a water permit, or an administrative order.  33 U.S.C. § 1319(d).

The Supreme Court reasoned that the incorporation of the civil penalty section into the citizen suit provision of the Clean Water Act "must be read as encompassing all the terms of the penalty provision[], including [its] limitations."

_____

[9] The Supreme Court also interpreted the citizen suit provision of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a); however, because the two provisions were so similar, the Court used the same analysis for both.  <u>Dep't of Energy v. Ohio</u>, 503 U.S. at 615–18, 112 S. Ct. at 1633–35.

Dep't of Energy v. Ohio, 503 U.S. at 617, 112 S. Ct. at 1634. Importantly, for purposes of Clean Water Act § 1319(d), "person" does not include the United States, which means that the civil penalty section does not apply to the United States. Id. at 617–18, 112 S. Ct. at 1634–35. The Court rejected Ohio's argument that the inclusion of the United States in the citizen suit provision overrides the limitations on the civil penalty section, explaining that rejection on the ground that the "special definition" of "any person" in Clean Water Act § 1365(a)(1) "go[es] to the clauses subjecting the United States to suit, but no further." Id. at 619, 112 S. Ct. at 1635. Absent "[a] clear and unequivocal waiver" of sovereign immunity, the Supreme Court held that the United States is not subject to punitive fines for past conduct under the Clean Water Act. Id., 112 S. Ct. at 1635.

In City of Jacksonville v. Department of the Navy, decided after the district court's ruling at issue here, we stated the general principles governing waivers of sovereign immunity as follows:

> In order for this Court to find a waiver of sovereign immunity with regard to punitive penalties, it must be unequivocally expressed in the statutory text. See Lane v. Pena, 518 U.S. 187, 192, 116 S.Ct. 2092, [2096 . . .] (1996). Any waiver of immunity must be strictly construed in favor of the sovereign, and it cannot be enlarged beyond what the statutory language allows. See id. See also United States Dep't of Energy [v. Ohio], 503 U.S. 607 at 615, 112 S.Ct. [at 1633 . . .]. Moreover, where a waiver would authorize payments from the

40

federal treasury, [. . .] it "must extend unambiguously to such monetary claims." Lane, 518 U.S. at 192, 116 S.Ct. [at 2097].

348 F.3d 1307, 1314 (11th Cir. 2003). We went on to hold in City of Jacksonville that the Clean Air Act's general waiver of sovereign immunity contained in §118(a), 42 U.S.C. § 7418(a), which is sometimes called the "federal facilities provision," is limited to coercive fines. 348 F.3d at 1317. We also held that § 304(e), 42 U.S.C. §7604(e), which governs state enforcement actions against the federal government in state venues, does not waive the United States' sovereign immunity as to punitive fines. Id. at 1319. Given those holdings, the Sierra Club's position comes down to an assertion that § 304(a), by authorizing civil suits, waives the federal government's sovereign immunity as to punitive fines. It does not.

There is only one relevant difference between the Clean Water Act citizen suit provision involved in Department of Energy v. Ohio and Clean Air Act § 304(a). The Clean Water Act provision is tied to that act's civil penalty provision, while § 304(a) does not refer to the Clean Air Act's civil penalty provision, § 113(e)(1), 42 U.S.C. § 7413(e)(1), but instead provides that "appropriate civil penalties" are authorized. The Sierra Club argues because § 304(a) does not incorporate a limitation from another part of the Clean Air Act as does the Clean Water Act citizen suit provision, the inclusion of "United States" in § 304(a)(1)

constitutes a sufficient waiver of the sovereign immunity against punitive fines for past conduct.

If we held that, we would be ignoring a critical aspect of the Supreme Court's analysis in <u>Department of Energy v. Ohio</u>, which applies equally to the Clean Air Act's § 304(a). The Supreme Court explained that inclusion of the United States in a provision authorizing suit "against any person" is limited to that "clause or sentence alone." 503 U.S. at 619, 112 S. Ct. at 1635. For our purposes, § 304(a), as excerpted above, contains two relevant sentences. The first one, which includes three numbered clauses, authorizes suit against any person, including the United States, who is in violation of an emission standard or limitation. The second sentence grants federal district courts jurisdiction over those suits and the power to impose "any appropriate civil penalties." Those two grants of power are distinct. The first grant vests power in citizen plaintiffs to bring suit; the second one vests enforcement power in the district courts, including the power to impose appropriate civil penalties.

Applying the Supreme Court's reasoning in <u>Department of Energy v. Ohio</u>, it follows that the grant of authority in the first sentence of § 304(a) for citizens to sue the federal government for Clean Air Act violations does not necessarily carry over to the grant of power to federal district courts to impose civil penalties in citizen

42

suits under the act. The inclusion of the United States in the first sentence does not include it by necessary implication in the second one. It does not because there are authorized remedies against the United States, such as declaratory and injunctive relief, other than the imposition of punitive civil penalties for past conduct. As a result, including the United States in the first sentence's list of potential defendants serves a purpose, even though punitive civil penalties against it would not be "appropriate" within the meaning of the second sentence. The provisions may rationally be read to permit declaratory and injunctive relief against the United States and its agencies but not punitive fines or civil penalties for past conduct. And so long as we may read the statutory provisions in a rational way not to waive sovereign immunity, we must read them that way. City of Jacksonville, 348 F.3d at 1314 (explaining that "[a]ny waiver of immunity must be strictly construed in favor of the sovereign").

Having decided that the waiver contained in § 304(a)(1) does not itself authorize the imposition against the United States of punitive fines for past conduct, we are left with the Sierra Club's contention that the grant of jurisdiction in the second sentence of § 304(a) is enough to waive sovereign immunity against punitive fines. That sentence authorizes federal district courts "to apply any appropriate civil penalties" in citizen suits. 42 U.S.C. § 7604(a). Although the term

43

"civil penalties" encompasses both punitive and coercive fines, the modifier "appropriate" limits the district court's power to impose civil penalties and suggests that some civil penalties are not appropriate.

As applied to federal government entities, punitive fines are not appropriate unless Congress "unequivocally expresse[s]" in the statutory text the intent to waive sovereign immunity for punitive fines.  See Lane, 518 U.S. at 192, 116 S. Ct. at 2096; see also Ruckelshaus v. Sierra Club, 463 U.S. 680, 682–86, 103 S. Ct. 3274, 3276–78 (1983) (holding that Clean Air Act § 307(f), which authorizes an award of "appropriate" attorney fees, "modifies but does not completely reject the traditional rule that a fee claimant must 'prevail' before it may recover attorney's fees"). The federal facilities provision of the Resource Conservation and Recovery Act exemplifies an unequivocal expression:  "The . . . substantive and procedural requirements referred to in this subsection include . . . all civil and administrative penalties and fines, regardless of whether such penalties or fines are punitive or coercive in nature . . . . The United States hereby expressly waives any immunity otherwise applicable to the United States . . . including . . . any . . . civil or administrative penalty or fine referred to in the preceding sentence . . . ." 42 U.S.C. § 6961(a) (emphasis added).  This language illustrates that Congress knows how to

44

write an unequivocal and unambiguous waiver of sovereign immunity when it wants to do so.

Congress did not use in § 304(a) of the Clean Air Act the kind of clear and unambiguous language it used in the Resource Conservation and Recovery Act. Instead, it used language that, at best, permits an inference that Congress intended to waive the United States' sovereign immunity against punitive fines for past conduct. That is not enough: Where "[a] clear and unequivocal waiver . . . cannot be found[,] a broader waiver may not be inferred." Dep't of Energy v. Ohio, 503 U.S. at 619, 112 S. Ct. at 1635; see also United States v. Nordic Village, Inc., 503 U.S. 30, 37, 112 S. Ct. 1011, 1016 (1992) (noting that where there is a "plausible" reading of a statute that does not result in a waiver of sovereign immunity, that "is enough to establish that . . . imposing monetary liability on the Government is not 'unambiguous' and therefore should not be adopted").

Because the Clean Air Act § 304(a) does not waive the United States' sovereign immunity against punitive fines for past conduct, we affirm the district court's grant of summary judgment to TVA on the Sierra Club's claim for civil penalties for past opacity violations.

## IX.

We affirm the district court's grant of summary judgment to TVA on the Sierra Club's claim as to violations of the 20% opacity limitation occurring before May 20, 1999, and on its request for civil penalties for any violations. We reverse summary judgment for TVA on the Sierra Club's claim as to violations of the opacity limitation on or after May 20, 1999. We remand for further proceedings consistent with this opinion.

**AFFIRMED in part, REVERSED in part, and REMANDED.**